ANDREW BURPEE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burpee v. Commissioner
Docket No. 5922-79.
United States Tax Court
T.C. Memo 1983-710; 1983 Tax Ct. Memo LEXIS 82; 47 T.C.M. (CCH) 444; T.C.M. (RIA) 83710; November 29, 1983. Bruce I. Hochman and William M. Weintraub, for the petitioner. Marshall W. Taylor, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent has determined the following deficiencies in petitioner's Federal income taxes: Year
Deficiency
1972
$1,989.00
1973
17,564.74
1974
36,414.00
1975
68,854.90
The dispute involves various claimed deductions and credits resulting from petitioner's acquisition of a motion picture in 1975. [1] The dispositive issues are largely factual. The principal issue is whether petitioner entered into his motion picture transaction with an actual and honest objective of making a profit so as to permit him to claim depreciation, expenses, and an investment tax credit. A related issue is whether there was a genuine indebtedness so as to permit petitioner to deduct $44,400 of prepaid *85 "interest" on a non-recourse debt of $740,000 payable only out of the film rentals. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Santa Ana, California, at the time he filed his petition herein. Petitioner timely filed individual Federal income tax returns for the years 1972 to 1975 with the Internal Revenue Service Center at Fresno, California. Background of Persons and Companies Involved
Petitioner was licensed *86 as a chiropractor by the State of California in 1963. He purchased a private practice in Orange County in 1968.In late 1974, petitioner hired Barry Tydings and his company (Tydings) as his business manager and investment advisor.Petitioner hired Tydings to improve the profitability of his practice. By 1975, petitioner's practice had become very successful. For 1975, petitioner reported from his practice gross income of $324,549 and net income of $137,258. For 1976, petitioner reported $128,000 of wage income paid to him by his professional service corporation. Tydings also made petitioner aware of the need for tax planning, a need that had become more pressing due to Tydings' success in increasing the profitability of petitioner's practice. In 1972, Al Landry (Landry), Michael Betterton (Betterton) and other individuals founded American Film Brokers (AFB). From AFB's inception, Landry has been its president. Betterton served as vice president and chief financial officer from 1972 until 1976, when he left AFB and sold his interest. Prior to 1972, Landry and Betterton had each invested in a motion picture, and Landry had organized a nonprofit company to help various civic *87 organizations raise funds by showing films. They had no other experience in the movie industry. Since 1969, both Landry and Betterton had been business acquaintances of Tydings (petitioner's business manager), and between 1969 and 1975, Tydings would meet Landry and Betterton from time to time on both business and social occasions. Raymond Axelrod (Axelrod), though not a founding member, had also joined AFB in 1972. Axelrod had extensive experience in the film industry, having been previously employed in managerial capacities by Warner Brothers, United Artists, Eagle Lion, and Allied Artists. Axelrod was AFB's general sales and distribution manager during 1975 and 1976. During at least 1974 and 1975, AFB, working primarily through Aspen Management Ltd. (Aspen), was engaged in the creation and sale of tax shelter film investments. Aspen, Betterton's alter ego, was in the financial consulting business, with a network of contacts with lawyers, accountants, and investment advisors throughout Southern California. During 1974, Landry sought potential purchasers of film shelters through Tydings, but Tydings did not direct any clients to AFB in that year. During 1975, Tydings more *88 actively investigated AFB movie shelters for several clients, and initiated discussions with AFB on petitioner's behalf. Background of the American Film Brokers Shelter Program
In 1974 and 1975, AFB examined many films, and acquired some 17 or 18 films from various producers. Generally, AFB would acquire films that the major or large independent distributors had declined to distribute. The filsm AFB acquired would generally be obtained from the producers under contracts calling for cash or other consideration (such as payment of the producer's outstanding film laboratory bills) as a down payment and percentage payments out of future distribution income. In such deals, the primary area of negotiation with the producers would be the amount of the down payment. AFB always tried to get the film for the lowest amount of cash possible and to have the producer take his consideration in the form of a percentage of the income to be generated by the distribution of the film. Generally, Betterton would conduct AFB's negotiations with the film producers. Betterton did not consider himself qualified to judge the commercial feasibility of films. During 1975, Alexrod was the only *89 AFB employee with the expertise and background to evaluate the commercial feasibility of films. Notwithstanding Axelrod's expertise and Betterton's relative lack of expertise, AFB generally did not seek Axelrod's advice regarding the maximum down payment AFB should pay on films it was acquiring, although this was sometimes done. Axelrod's duties in connection with AFB's film acquisitions were confined to viewing the pictures, judging their suitability within AFB's program, and informing Betterton or Landry that he had located potentially suitable films. Betterton and Landry, not Axelrod, would decide which films AFB would acquire. After AFB had acquired films, Axelrod managed the marketing and distribution of the films. AFB would reconvey its films to investors, generally limited partnerships. AFB located its potential investors primarily through Aspen. The reconveyances to partnerships generally had a cash down payment, principal and interest payments for seven years, with the balance of a promissory note due and payable in 10 years. A side letter allowed the investors to return the film in lieu of payment of the note. The reconveyance transactions were always structured so *90 that the cash consideration received by AFB from investors would exceed the cash AFB had paid to the producers. Each reconveyance transaction to an investor partnership was accompanied by a film distribution agreement between AFB and the partnership, under which AFB was engaged to distribute the film, and the investor could change distributors only by paying the full contract amount for the film. In other words, unless the investor paid the full amount, he was wedded to AFB. It was AFB's intention to retain control of the film in that way. Due to the passage of the Tax Reform Act of 1976, AFB phased out its film shelter business in 1976. History of The Adulteress
In 1972, Norbert Meisel (Meisel) produced and directed his first motion picture, entitled The Adulteress (sometimes referred to as "the film"). He financed the film through a limited partnership called Films International, in which he was the general partner. The film cost $75,000 to produce, including some $45,000 in cash and $30,000 in deferments for the actors and others. Upon completing the film, Meisel tried to secure a distributor. Finally, after numerous rejections by major distributors and others, *91 Meisel entered into a distribution agreement with Paul Mart Productions, Inc., on December 28, 1973. Under the agreement, Paul Mart Productions, Inc., was to distribute the film in the domestic territory for the calendar year 1974 and years beyond until the agreement was terminated in writing by either party. Shortly thereafter, Paul Mart Productions, Inc., was sold to an employee named Tod Jonson, who operated the business under the name Key Films. In 1974 and 1975, most of the films that Key Films distributed were X-rated adult entertainment pictures. Although The Adulteress is not a pornographic movie, and was not marketable as X-rated adult entertainment, Key Films (and its predecessor) distributed the film largely to adult theaters that specialized in X-rated pictures. Consequently, the film was poorly received and was not widely shown. After recovering the cost of prints and other expenses, Key Films netted only a few thousand dollars, some $3,000 to $5,000.Except for an initial advance of $2,000 or $3,000 that Meisel used to obtain 8 to 10 prints from the film processing laboratory that had a lien on his movie, Key Films paid no money to Meisel. [2]
*92 Acquisition by AFB of The Adulteress and AFB's Contracts with Petitioner
In the fall of 1975, Meisel and Axelrod began discussing Meisel's film, The Adulteress. Meisel, dissatisfied with Key Films' distribution of his film and financially desperate at the time, obtained from Key Films a release of the distribution rights to The Adulteress. That release is dated December 21, 1975, two days after the date of the agreement by which Meisel conveyed The Adulteress to AFB and four days after the date of the agreement by which AFB conveyed the film to petitioner. Axelrod was not asked for, nor did he provide to any of AFB's responsible officers, any estimates of the future revenues, distribution expenses, or other data from which AFB's officers could reach an informed decision respecting the value of The Adulteress. While Axelrod recommended that AFB acquire Meisel's film, he took no part in determining any of the terms of the agreement, including any purchase price. Even though Meisel dealt solely with Axelrod, Axelrod merely passed on to him AFB's terms as set by Landry. Meisel simply accepted the terms presented to him, and the only negotiations between *93 AFB and Meisel related to the amount of cash down payment he was to receive. AFB, through Landry, and Meisel executed an agreement (the Meisel agreement), dated December 19, 1975, that conveyed The Adulteress to AFB. [3] Under that agreement, Meisel received a total of $14,800 in cash, of which he paid approximately $4,100 to $5,100 to Key Films to cover the costs of the 8 to 10 film prints and to have Key Films release its distribution rights to the film and those 8 to 10 prints back to him. Key Films would not release its distribution rights until it received the money for the film prints. Under the agreement with AFB, Meisel was also entitled to receive 50 percent of all gross proceeds AFB received from the distribution of the film, up to a total of $765,000. The $765,000 deferred contract balance on the Meisel contract was not bargained for or negotiated between the parties. The Meisel contract does not provide a fixed date for unconditional payment of the deferred contract balance. *94 On December 17, 1975, petitioner and Tydings executed a limited partnership agreement under the name "Sunshine Ltd." Tydings was to be the general partner possessing a one percent interest and petitioner was to be the initial limited partner, possessing a 99 percent interest. Their signatures were notarized. [4] Tydings, as general partner of Sunshine Ltd., signed a purchase agreement for The Adulteress. This agreement receited an effective date of December 15, 1975. Petitioner signed the Sunshine Ltd. partnership agreement apparently without reading it first. Upon reading the agreement and discovering that it called for Tydings to be a co-owner of the film, petitioner informed Tydings that this arrangement was unacceptable. Although petitioner, Tydings, and Landry all intended the partnership agreement and partnership purchase contract to be effective when they signed these documents, they all seem to agree that the partnership transaction was somehow rescinded. On or about December 18, 1975, [5] *95 petitioner entered into an agreement with AFB (the Burpee contract) by which AFB conveyed its rights in The Adulteress to petitioner. Two substantially identical written documents appear to reflect this transaction in its final, or close to final, form. They are an unsigned typewritten agreement reciting an effective date of December 18, 1975, and a signed typewritten agreement reciting an effective date of July 10, 1975. Petitioner and Tydings view the signed document reciting an effective date of July 10, 1975, as the operative agreement. Landry, however, believed that the unsigned document reciting a date of December 18, 1975, was the effective agreement. The document reciting an effective date of July 10, 1975, in fact, was not executed until sometime on or around December 18, 1975.By the Terms of these instruments, petitioner agreed to acquire the film for $765,000, payable with a $25,000 cash down payment, with the remaining contract balance of $740,000, together with six percent interest, due on a nonrecourse basis when and as earned from 50 percent of the net proceeds of distribution or disposition of the film. There was no time limit for payment of the contract balance *96 of $740,000, and AFB's sole remedy against petitioner was to foreclose on the film. The Burpee contract also called for the preparation of a Security Agreement and financing statement and the public filing of the financing statement in the Office of the Secretary of State. The Security Agreement and financing statement were not so filed and in fact were never prepared. *97 On or around the same date that the Burpee contract was executed, petitioner entered into a world-wide distribution agreement with AFB for The Adulteress. This distribution agreement appears to be reflected in its final, or close to final, form in an instrument executed by petitioner and AFB and reciting a date of execution of December 18, 1975. By the terms of the distribution agreement, petitioner was entitled to receive the film rentals from exploitation of the film, reduced by--(1) subdistributor commissions, (2) reimbursements to AFB for up to $15,000 of actual print and advertising cost, and (3) a 10 percent deduction (limited to $20,000) as compensation to AFB for marketing and administrative overhead. Petitioner was also to prepay what was characterized as an initial advertising and promotional fee in the amount of $47,950. If the deferred contract balance was paid off, the entire arrangement changed. At such time, AFB was entitled to receive 35 percent of gross proceeds out of which it was to pay all expenses of promotion and distribution of the film. Of the proceeds payable to petitioner under the terms of the distribution agreement, the Burpee contract required *98 him to pay over 50 percent in retirement of the deferred contract balance, or 75 percent if interest on the balance should be in arrears more than 12 months. The only way that petitioner could terminate the distribution agreement with AFB and take the film to another distributor was to pay to AFB the entire balance of the contract price (represented by the nonrecourse debt). [6] This was consistent with AFB's general policy in marketing its movie shelters, whereby AFB intended to retain control over the film and to tie the investor to AFB as the sole distributor.
The Burpee contract does not provide a fixed date for unconditional payment of the deferred contract balance. The Burpee contract *99 contains no listing of the physical properties conveyed to petitioner. Physical possession of the film and related properties was at all times in AFB's exclusive control. The negotiations on petitioner's behalf for his acquisition of The Adulteress were conducted entirely by his business manager, Barry Tydings. Tydings' primary area of expertise in judging investments lay in the area of real estate; Tydings is not an expert on the marketing of films. From the outset of negotiations, AFB had set both the $765,000 contract price and the amount of up-front cash ($104,400); these amounts were not flexible or subject to negotiation. The only aspects of the transaction that concerned petitioner were that he be subject to no further requirements to pay additional cash and that he have no co-venturers with him. The dealings between AFB and petitioner (acting through Tydings) went through a series of phases reflected in written documents prepared both before and after consummation of the transaction; however, in all phases, both the cash down payment of $25,000 and the remaining up-front cash of $79,400 remained constant. Among the various allocations of and labels placed on *100 the remaining $79,400 up-front cash were the following: (a) Initial advertising and
promotional fee
$47,950.00
4-1/4 point loan fee
31,450.00
$79,400.00
(b) Distribution and advertising
fee
$35,000.00
Loan fee (6 points)
44,400.00
$79,400.00
(c) Total capital contribution to
Sunshine Ltd, partnership of
$104,400 (allocation unspecified)
(d) Fee for initial distribution
and advertising
$35,000.00
12 months' prepaid interest
44,400.00
$79,400.00
The actual labels to be attached to the cash paid by petitioner were of no concern to petitioner or his negotiating agent, Tydings, as long as the total amount was no more than $104,400. The labeling was not in fact negotiated. Pursuant to the terms of the Burpee contract, petitioner was permitted, but not obligated, to prepay up to one year's "interest" on the deferred nonrecourse contract balance. Of the $104,400 paid over by petitioner, $44,400 was allocated to prepaid interest. [7]
*101 In the course of his dealings with AFB on petitioner's behalf, Tydings (1) received no written or oral projections of the probable income to be generated by the film; (2) received no written or oral projections of expenses of distributing the film other than the lump sum distribution and advertising fee of $35,000; (3) received marketing plans for the film only in the form of general oral representations that the film would be marketed primarily in the theatrical market and secondarily on closed circuit television on a joint basis with other films being handled by AFB; (4) failed to ask for and thus received no information about previous play dates or test marketing of the film; (5) failed to cause the film to be screened for potential exhibitors; (6) failed to receive any information regarding the production cost of the film; (7) failed to consult with attorneys on such matters as copyright, protection of title and title insurance; (8) formulated no opinion about the type of markets in which the film would play; and (9) failed to determine who the actual holder of the copyright was. Before executing his agreement with AFB, petitioner (1) was unaware of the mechanics of film purchase *102 transactions, such as acquisition of valid copyright, and failed to secure advice or opinion letters regarding such issues; (2) failed to view the film; (3) received no projections of income from the film; (4) received no information concerning the expenses that would be involved in advertising and promoting the film; (5) failed to have an independent outsider evaluate the film for potential audience appeal; (6) failed to inquire whether the film had been shown before; and (7) failed to determine how much box office gross would have to be earned to pay off the $740,000 contract balance. Petitioner had no previous experience with film investments prior to his dealings regarding The Adulteress.[8] Despite his investment inexperience, petitioner had long been interested in the motion picture industry. Before entering private practice in 1968, petitioner had become acquainted with many performers through his employment at various Beverly Hills health clubs. Petitioner had worked briefly as an actor in 1967, and was under consideration for a minor movie role in 1968 when he entered private practice. Petitioner characterized his interest in the entertainment industry as "kind of *103 a hobby." One of petitioner's motivations in purchasing the film was what he characterized as "pride of ownership." He viewed his investment in The Adulteress as "a way of getting into the industry and being associated with it." As part of his dealings with AFB on petitioner's behalf, Tydings received a detailed tax opinion letter from the law firm of Eliasberg and Prager containing an analysis of the tax consequences of acquisition of a film by a limited partnership. Petitioner also received a copy of the tax opinion letter. Eliasberg and Prager had issued its opinion letter to AFB, and AFB distributed the opinion letter as part of its tax shelter program. As part of his negotiations on petitioner's behalf, Tydings received from AFB and provided to petitioner's accountant a detailed schedule of the tax incidents resulting from a single buyer's acquisition of The Adulteress for $104,400 initial cash and $765,000 total contract price. This schedule showed the following: "THE ADULTERESS" $765,000 PURCHASE PRICE--ONE *104 BUYER Cash Requirement for 1975
Deductions for 1975
Down Payment
$ 25,000
Investment Tax Credit
Loan Fee (6 Points)
44,400
(x 200%)
$153,000
Distribution and Advertising
Bonus Depreciation
2,000
Fee
35,000
Depreciation DBL Decl.
1/2 yr (ADR)
95,125
$104,400
Deductible Expenses
79,400
$329,525
$329,525
Tax Deductions = 316% Deductibility in 1975
$104,400
Cash Required
DEPRECIATION IN SUBSEQUENT YEARS - 8 YEAR LIFE
1976
$166,469
1977
124,852
1978
68,100
1979
68,100
1980
68,100
1981
68,100
1982
68,100
1983
34,050
Before executing the agreement with AFB, petitioner consulted with an accountant regarding the tax incidents of the transaction. The detailed tax computations provided to Tydings contained no data about recapture or recognition of income in later years. The Eliasberg and Prager opinion letter contains a discussion, equaling slightly more than one of its 31 pages, of the tax incidents of disposition of a partnership interest or a partnership disposition of a film. Of this discussion, the lengthiest portion, constituting one paragraph, involves repossession *105 of the film by the seller.Tydings informed petitioner that the total tax incidents of the film transaction, even taking into account future recognition of income, if any, could work out very favorably. Petitioner's claimed tax savings resulting from the film transaction as reflected on his returns for 1975 and 1976 alone (including carrybacks) were as follows: 1975
$ 67,667.90
1976
56,535.00
Carrybacks to
1972-1974
55,967.74
Total:
$180,170.64
Transfer of copyright and recordation thereof are part of customary business practice in the film industry when interests in films are bought and sold. Copyright publication of The Adulteress was in the name of Films International, and no formal transfer of copyright from Films International to Cry of the Rooster, Ltd. or to Meisel ever occurred. Petitioner at no time filed or caused to be filed any publicly recorded transfer of copyright for The Adulteress. Neither petitioner nor AFB obtained any errors and omissions insurance (title insurance) regarding The Adulteress, even though such insurance is customarily secured in the industry when a motion picture is transferred. Axelrod, though informed by *106 Meisel that there had been test marketing of The Adulteress, failed to contact the persons who had allegedly conducted the test marketing. Without contacting those persons who had caused The Adulteress to be played in various theaters, Axelrod could not determine if those play dates represented a "test marketing" or merely an unsuccessful general release of the film. The Adulteress, notwithstanding advertising materials for the film showing an "R" rating, has never received a rating from the Motion Picture Association of America (MPAA). Responsible persons at AFB knew or should have known of the documentation required to show authority to use an MPAA rating and they had even set up a file folder in their file series on The Adulteress to accommodate the rating documents. Acquisition of an MPAA rating is customary business practice in the film industry when a film is released for distribution. AFB's Distribution of The Adulteress
Although a portion of petitioner's up-front cash was allocated to distribution and advertising expenses, Tydings and petitioner were not informed how AFB would spend it. AFB did not segregate the "up-front" distribution expense *107 money paid over by petitioner from the funds it received from other investors. In AFB's view, there was no relationship between the amount paid by investors for distribution expense and the amount AFB actually spent on distribution. AFB incurred no further expense for prints and advertising make-up relating to The Adulteress beyond the amounts it had already paid to acquire 10 prints and certain advertising materials from Meisel. Although the records of AFB reflect $6,821.18 in expense associated with distribution of The Adulteress through 1980, $4,653.73 of such expense was subdistributor commission, which was a deduction from film rentals rather than an out-of-pocket expense of AFB. Only $2,167.45 represented actual cash expenditures by AFB. AFB never intended to spend money on an advertising campaign for The Adulteress and in fact did not do so. AFB had arrangements with 17 or 18 domestic subdistributors to handle actual bookings of their films for theatrical play dates domestically. Axelrod personally handled the Los Angeles area. Before its purchase, AFB did not screen The Adulteress for any of its subdistributors, not even its subdistributors in the South, *108 although Axelrod believed the South to be the primary market for such a film. When AFB secured a film, it would notify its subdistributors that the film was available. AFB would not send a print of the film to a subdistributor unless the subdistributor expressed an interest. That same practice was followed in the case of The Adulteress.AFB sent 7 or 8 prints of The Adulteress out to its subdistributors. Only three subdistributors secured theatrical play dates for The Adulteress--the Cleveland/Cincinnati subdistributor secured 15 play dates, the Jacksonville subdistributor three, and the New Orleans/Memphis subdistributor one. AFB sent a print of The Adulteress to its subdistributor for the North and South Carolina area, but this subdistributor subsequently reported no play dates. For the Los Angeles market, Axelrod obtained only three successive bookings at the Cameo Theater, known as a "grind house" playing X-rated films 24 hours a day. Axelrod also had a one-time sale to an exhibitor group in Hawaii. AFB engaged Arista Films to handle foreign distribution, and later the Bloom Film Group to handle both foreign and television distribution. The Adulteress *109 had only two play dates in 1975--October 8 to 14 at the Embassy Theatre in Cleveland, Ohio, and October 24 to 26 at the Eastlake Theatre, also in Cleveland, Ohio. These play dates occurred before petitioner entered into his agreements with AFB. Each showing was for a flat rental of $50. Petitioner did not receive any of these rentals, nor has he ever received any rentals from AFB. Up to the time of trial, AFB had received a total of $17,138.12 in gross revenues from distributing The Adulteress, and net revenues of $10,316.94.No more than $4,904.77 of AFB's gross revenues were from domestic theatrical distribution; the remaining $12,233.35 was from foreign and/or television distribution. Notwithstanding its obligations under the terms of the distribution agreement to pay over portions of distribution revenues to petitioner and to Meisel, AFB has paid no money to either of them. The actual history of income and expense from distribution of The Adulteress is such that, under the terms of their contracts, some revenues should have been paid over to both petitioner and Meisel. Petitioner has received only two communications from AFB concerning its distribution of the film. *110 One was a short letter announcing an opening in Jacksonville, Florida, which contained no revenue or expense information. The other, a document not in evidence, petitioner remembered as setting forth a schedule of income received. Petitioner, though concededly unqualified to judge the accuracy of such data, did not seek the advice of anyone qualified to analyze the data. Although under the distribution agreement petitioner could have AFB's records audited, petitioner never did so. After making the agreements with petitioner and Meisel, AFB had a clear profit of approximately $90,000 if it made no effort at all to distribute The Adulteress. Normally, the cash down payment was where AFB, in effect, made its profit. Valuation of the Film
The Adulteress is a full-length (88 minutes) motion picture. The story involves a variation on the classic love triangle: Husband hires Other Man to work on his ranch. Husband is now unable to father a child; his impotence is psychological, caused by his responsibility for the death, years earlier, of his only child. Husband persuades Other Man to have an affair with Wife, so that Husband and Wife will no longer be childless. *111 Other Man and Wife fall in love and Husband becomes jealous. Husband persuades Other Man to leave. Other Man asks Wife to leave with him; unknown to Husband, Wife tells Other Man no. Husband attacks Other Man, but by mistake kills Wife. The Adulteress was the first effort of its producer and director, Norbert Meisel. The film is technically poor in its sound, film editing, camera work, and story coherence. The story has little appeal to any potential audience. The Adulteress is not a pornographic movie and would not appeal to the adult entertainment market. The film has some sexually-oriented content that does not advance and probably detracts from the story line. The film lacks entertainment value. Of the lead actors, Eric Braeden had the most prominent name, having had a significant role in The Rat Patrol, a 1960's television series. Tyne Daly, though possessing some movie and television credits, was not widely known in 1975. [9] Gregory Morton was completely unknown.None of these performer's names would independently create a box office draw from their presence on a theater marquee.
*112 Generally, a film's technical quality enhances its chances of success, although films creating or riding a popular trend can be successful even if the technical elements are not first quality. In 1975, The Adulteress was not creating or riding any known popular trend of any kind. Although the technical defects of The Adulteress could be remedied to some extent and with substantial expense and although the potential box office gross could be improved by an aggressive marketing campaign, the additional expenses would offset any likely increase in gross income. AFB represented to Tydings that theatrical revenues were the primary anticipated source of income from the film. Axelrod, AFB's distribution manager, perceived The Adulteress as an "exploitation" picture, meaning a film with sexually-oriented content but not "X" rated or pornographic. Such films are primarily suitable for distribution at drive-in theaters and exploitation houses. Axelrod's attempts to distribute the film in those markets in the Los Angeles area were singularly unsuccessful. The marketability of The Adulteress was further reduced by the film's lack of MPAA rating because major theater chains *113 generally will not play unrated films. Most film distribution agreements call for the distributor to receive a percentage of the box office receipts ("percentage rentals"). Film distribution agreements calling for a set, flat-rental fee ("flat rentals") are less desirable than percentage rentals, and indicate that the film is unsuccessful or has exhausted its potential for higher earnings. It would be very unusual to start out distribution of a film on flat-rental terms. This would be done only when the distributor perceives that there is little or no potential to recoup outlays for prints and advertising. When distribution is started by use of flat rentals, it is an expression of lack of confidence in the film by its distributor. When initial distribution is accomplished through use of low flat rentals, exhibitors in the area generally will not thereafter book the picture in a better theater. From the outset of AFB's distribution efforts, the film rental potential of The Adulteress was extremely limited. The film's chances of testing out on percentage engagements with exhibitors were small, and the film would almost immediately be relegated into the low-earning flat-rental *114 category.AFB's actual distribution of the film bears this out--most of the film's theatrical engagements were on low flat-rental terms ($50-$75), including its "openings" in the Los Angeles, Cleveland/Cincinnati, and New Orleans/Memphis Branches. The Adulteress would probably not be acquired by a television network and has little or no network value; it also would not be marketed in syndication as a single film. The Adulteress, if it could be distributed for television at all, would probably be placed in a 10 or 15 film syndication package, and would receive approximately one to one and one-half percent of the aggregate income from the package. In the type of syndication package in which The Adulteress could be marketed, television stations would have the right to reject any film. The quality of the film is bad, though marginally acceptable to television, but the story content and lack of rating are enough to cause most television buyers after screening the film to reject it. Likewise, because of its poor quality, the film's value for foreign distribution was also minimal. The fair market value of The Adulteress in 1975 was no more than $20,000 to $25,000. *115 On his returns for 1975 and 1976, petitioner claimed the following amounts of income and deduction from his film venture: 1975
1976
Gross Receipts
$ 857 Cost of Goods Sold
(1,173)
Depreciation
($111,000)
(186,857)
Interest on Business
Indebtedness
(44,400)
Advertising
(35,000)
(97)
Shipping
(215)
Net Loss
($190,400)
($187,485)
Petitioner computed his depreciation deduction using the 200 percent double declining balance method, a seven year useful life, and a cost basis of $765,000. Petitioner also claimed an investment credit of $76,500 in 1975, claiming the full 10 percent credit for property with a seven year useful life. Respondent initially allowed petitioner tentative refunds for 1972, 1973, and 1974. These refunds resulted from carrybacks to those years of petitioner's 1975 net operating loss and investment credit. See sec. 6411. [10] These carrybacks are wholly attributable to petitioner's film venture. Respondent has now determined that neither the deductions nor credit claimed by petitioner attributable to The Adulteress are allowable, and accordingly has determined deficiencies for the years 1972-1975. See sec. 6501(h), *116 (j); sec. 6213(b)(3). ULTIMATE FINDINGS OF FACT 1.Petitioner did not have an actual and honest profit objective in his movie venture involving The Adulteress.
2. The fair market value of The Adulteress in 1975 was between $20,000 and $25,000. 3. Both the contract price ($765,000) and the principal amount ($740,000) of petitioner's nonrecourse obligation substantially and unreasonably exceeded the fair market value of The Adulteress.
4.The $740,000 nonrecourse obligation did not constitute a genuine indebtedness. OPINION At issue in this case are deductions and credits claimed by petitioner as a result of his acquisition of the motion picture, The Adulteress. Respondent has disallowed these deductions and credits on a variety of theories. We begin by addressing the issue of whether petitioner's activities were engaged in for profit.
Petitioner claimed deductions for depreciation and advertising expense *117 and also claimed an investment tax credit. Section 167(a) permits a depreciation deduction for a reasonable allowance for the exhaustion of (1) property used in a trade or business or (2) property held for the production of income. Carrying on a trade or business is also a prerequisite to deductibility of business expenses under section 162.An activity does not constitute a trade or business unless the taxpayer engages in the activity for the predominant purpose and intention of making a profit. Flowers v. Commissioner,80 T.C. 914, 931 (1983); Siegel v. Commissioner,78 T.C. 659, 698 (1982); Brannen v. Commissioner,78 T.C. 471, 505-506 (1982), on appeal (11th Cir., Aug. 23, 1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The same kind of profit-making objective is a prerequisite for deductions under section 212(1) and (2), Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981); Jasionowski v. Commissioner,66 T.C. 312, 318-319 (1976), and for the investment tax credit under section *118 38. Flowers v. Commissioner,supra at 931, n. 24; Pike v. Commissioner,78 T.C. 822, 841-842 (1982). Thus, all of petitioner's claimed deductions and credits discussed above, hinge upon his objective to make a profit from his motion picture activities.
Although petitioner's profit motive need not be reasonable, nonetheless, he must have an actual and honest profit objective. Section 1.183-2(a), Income Tax Regs; Fox v. Commissioner,80 T.C. 972, 1006 (1983); Flowers v. Commissioner,supra,80 T.C. at 931; Dreicer v. Commissioner,78 T.C. 642 (1982), affd.     F. 2d     (D.C. Cir. 1983); Allen v. Commissioner,72 T.C. 28, 33 (1979); Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F. 2d 252 (2d Cir. 1967). The issue is one of fact to be resolved on the basis of all of the surrounding circumstances. Fox v. Commissioner,supra,80 T.C. at 1007; Flowers v. Commissioner,supra,80 T.C. at 931-932; *119 Lemmen v. Commissioner,supra,77 T.C. at 1340; Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F. 2d 578 (2d Cir. 1980). Petitioner has the burden of proving the requisite profit objective. Rule 142(a); Fox v. Commissioner,supra,80 T.C. at 1006; Flowers v. Commissioner,supra,80 T.C. at 932; Dreicer v. Commissioner,supra,78 T.C. at 644-645; Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F. 2d 170 (9th Cir. 1981). In making this factual determination, we give greater weight to objective factors than to the taxpayer's mere statement of his intent. Section 1.183-2(a), Income Tax Regs; Fox v. Commissioner,supra,80 T.C. at 1007; Flowers v. Commissioner,supra,80 T.C. at 932; Siegel v. Commissioner,supra,78 T.C. at 699; Churchman v. Commissioner,68 T.C. 696, 701 (1977). Section 1.183-2(b), Income Tax Regs. *120 , lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may approciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Although section 183 is actually an allowance provision rather than a disallowance provision, allowing limited deductions for nonprofit-making activities, Fox v. Commissioner,supra,80 T.C. at 1006; Brannen v. Commissioner,supra,78 T.C. at 500, the inquiry into the taxpayer's profit-making objective is the same. Accordingly, the factors listed in section 1.183-2(b), Income Tax Regs. *121 , provide a useful framework for resolving this factual issue.See Fox v. Commissioner,supra,80 T.C. at 1007; Flowers v. Commissioner,supra,80 T.C. at 931-932; Brannen v. Commissioner,supra;Siegel v. Commissioner,supra,78 T.C. at 699; Wildman v. Commissioner,78 T.C. 943, 953-954 (1982). Our analysis of the facts of this case convinces us that petitioner did not undertake him motion picture venture with the requisite profit objective. By each one's own admission, neither petitioner nor his business manager, Tydings, was qualified to judge motion picture investments. Nonetheless, they sought no competent, independent outside advice, but instead chose to rely solely upon the representations of American Film Brokers (AFB). AFB was hardly a disinterested party. Neither petitioner nor Tydings undertook the sort of inquiry that a serious, prudent investor would undertake, including investigations into copyrights, errors and omissions (title) insurance, production costs, and the prior distribution history of the film. Moreover, through the distribution agreement, petitioner *122 wedded himself irrevocably to AFB; the only way he could take his film to another distributor would be to pay AFB the $740,000 nonrecourse balance of the "purchase price." [11]
*123 Consistent with petitioner's indifference to customary business practices in the film industry is the confusing and conflicting paper trail created by petitioner and AFB. In addition to back-dating documents, the various witnesses who were parties to the agreements identified different documents as the operative agreements. Moreover, there is the matter of the fully executed limited partnership agreement for Sunshine Ltd., and the fully executed purchase contract for the film by Sunshine Ltd., which petitioner and Tydings claim were somehow rescinded. Finally, the labels placed on petitioner's up-front cash are varying and inconsistent. None of these actions evidence the conduct of an individual with an actual and honest profit objective. AFB's efforts to distribute petitioner's film are also revealing. AFB was in the business of marketing movie shelters. AFB made its profit on the spread between the up-front cash it paid to the film producers and the up-front cash it received from its investors.Despite petitioner's prepayment of at least $35,000 denominated as distribution or advertising expenses, that amount had absolutely no relation to the amounts AFB would actually *124 expend in promoting the film. In fact, AFB intended to spend little, if any, money in promoting this film and, during the five years in evidence before the Court, spent no more than $2,167.45 promoting and distributing the film. In qualitative terms, AFB's distribution efforts were minimal and passive at best. AFB merely notified its subdistributors that the film was available and sent the film if the subdistributor showed interest. It did not screen the film for its subdistributors or make any effort to persuade the subdistributors to take the film. The film was unrated, which effectively barred it from the large theater chains. AFB rarely obtained percentage rental arrangements with subdistributors and theaters, but instead accepted flat rentals, indicating AFB's own recognition that the film as largely unmarketable. Petitioner's own expert witness characterized AFB's distribution efforts as "pathetic." Petitioner argues that the film's value and his profit objective cannot be determined from AFB's distribution efforts, arguing that another distributor could have made more money with it. In effect, petitioner seeks to insulate himself from the consequences of AFB's failure. *125 This argument is unavailing. Where an unqualified taxpayer such as petitioner conducts his "business" or for-profit activity through third parties and "expert" advisors, his profit objective is judged by the competence of his advisors and the manner in which the third party conducts the "business" or for-profit activity. Section 1.183-2(b)(1),(2), Income Tax Regs.; Flowers v. Commissioner,supra,80 T.C. at 932; Siegel v. Commissioner,supra,78 T.C. at 700-702; Brannen v. Commissioner,supra,78 T.C. at 509-511. To divorce petitioner's profit objective from AFB's inaction and/or disinterest would be particularly inappropriate upon the facts of this case, since petitioner's distribution agreement with AFB is effectively irrevocable. Petitioner's argument that his film's failure was based largely on AFB's failed cable TV venture is also unavailing. First, the testimony by the various AFB principals concerning the cable venture was fairly generalized and completely unpersuasive. From the testimony of respondent's experts, *126 we have found as a fact that the television value of The Adulteress, even in cable TV syndication, was minimal at best, because of its story content and poor technical quality. Finally, none of the documents introduced into evidence by petitioner purporting to show AFB's conduct of its cable TV venture mention The Adulteress, even though many of the documents purport to evidence movie rentals. Petitioner's actual conduct subsequent to his "purchase" of the film and engagement of AFB as distributor also belies an actual and honest profit objective. In the six years in evidence before the Court, petitioner received only two reports from AFB, and yet petitioner remained unconcerned. Despite his right under the distribution agreement to have AFB's books and records audited, petitioner has never exercised this right. Petitioner has never received any money from AFB's distribution of the film. He passively accepted AFB's explanation that all of his "share" had been credited against his nonrecourse obligation to AFB, even though under the terms of the agreements, petitioner was entitled to some of the money. [12]
*127 Posed against petitioner's indifference to the profit result of his motion picture venture are his financial status and tax avoidance motivation. Petitioner has never received a penny of income from this film. Petitioner has claimed large deductions from the film, primarily depreciation. These claimed deductions offset his high income from his practice as a chiropractor. It was upon Tydings' arrival as petitioner's business manager that petitioner's medical income suddenly increased. It was Tydings who made petitioner aware of the need for tax planning and Tydings who was primarily responsible for petitioner's acquisition of this movie. Petitioner's professed awareness of the possible adverse tax consequences at the back-end of his movie transaction [13] does not change our decision. Our decision is regard to the front-end of that transaction would of course impact upon those potential adverse tax consequences. See footnote 16 below. In any event, petitioner's purported awareness of these tax consequences was equivocal at best, and petitioner recognized that the recapture income was not certain. Regardless of this, we would not be persuaded differently even if petitioner had *128 complete and total understanding of possible adverse tax consequences at the back-end. We must decide the tax consequences of the transaction at the front-end. Petitioner's speculation that there may be recapture income down the road and that taxes are merely being deferred rather than avoided seems to assume what we are called upon to decide in this case. *129 Funlike nearly all of the other cases involving movies, books, recordings, and the like, petitioner here could be said to have had a strong element of personal pleasure involved in his motion picture venture. See section 1.183-2(b)(9), Income Tax Regs. Petitioner candidly admitted that his interest in the motion picture industry was "kind of a hobby," that he felt proud of his "ownership" of The Adulteress, and that this transaction was his way of getting into and being associated with the movie industry. While we give some weight to the hobby aspects of this transaction, it is just one of the many factors we have weighed. Also, as discussed in greater detail below, the total "purchase price" and principal amount of the purported nonrecourse obligation grossly exceed the fair market value of the movie. This also indicates that petitioner did not possess an actual and honest profit objective. See Flowers v. Commissioner,supra,80 T.C. at 937. We recognize that motion pictures are, at best, a speculative activity and that the speculative nature of an investment does not of itself indicate the absence of a bona fide profit *130 objective. See section 1.183-2(a), Income Tax Regs.; Fox v. Commissioner,supra,80 T.C. at 1017-1018. We have not disallowed petitioner's claimed deductions and credits because petitioner invested in a speculative venture and lost, but because petitioner never intended his acquisition of the film as a money-making venture. While petitioner professed great excitement at purchasing a movie and while he did pay AFB $104,400 in up-front money, the Court is satisfied that petitioner was really purchasing tax deductions, including a three for one write-off in the first year alone. Our observation in Flowers v. Commissioner,supra,80 T.C. at 941, is extremely appropriate in this context: Where, as here, the promised tax benefits are suspiciously excessive and the transaction as a whole is entered into and carried out with the complete indifference to profit, it is clear what the parties intended to accomplish. The * * * arrangement was entered into by [the taxpayer] solely for the purpose of reducing the [taxpayer's] tax burdens * * *. If anything can be described as an "abusive tax shelter," this is it. *131 Petitioner's objective in acquiring The Adulteress was tax avoidance, not the generation of profits. And since petitioner earned no income from The Adulteress in 1975, he is entitled to no deductions under section 183(b). [14]
Our holding that petitioner did not acquire The Adulteress with an actual and honest profit objective precludes petitioner's claimed deductions for depreciation and advertising expenses, and his claimed investment tax credit. See Flowers v. Commissioner,supra,80 T.C. at 931. This holding does not necessarily *132 preclude petitioner's claimed deduction for "prepaid interest." Nonetheless, we find petitioner's claimed deduction for interest is not allowable.
To qualify for a section 163 deduction, the taxpayer must pay for the use or forbearance of money upon a genuine indebtedness. Norton v. Commissioner,474 F. 2d 608, 610 (9th Cir. 1973), affg. a Memorandum Opinion of this Court; Fox v. Commissioner,supra,80 T.C. at 1019-1020; Flowers v. Commissioner,supra,80 T.C. at 942. As we stated in our recent Flowers opinion, 80 T.C. at 942: Where both the purchase price and the lesser principal amount of the nonrecourse note which makes up a portion of such purchase price unreasonably exceed the value of the property acquired, then no "genuine indebtedness" exists and no "investment in the property" occurs. Estate of Franklin v. Commissioner,544 F. 2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *133 Odend'hal v. Commissioner,80 T.C. 588, 604 (1983); Hager v. Commissioner,76 T.C. 759, 788 (1981); Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F. 2d 855 (9th Cir. 1982); Beck v. Commissioner,74 T.C. 1534 (1980), affd. 678 F. 2d 818 (9th Cir. 1982). Here, too, the $740,000 nonrecourse obligation is not a genuine indebtedness.[15]
*134 We conclude that the fair market value of The Adulteress when petitioner acquired it in 1975 was no more than $20,000 to $25,000. The $20,000 figure is the higher end of the value ranges determined by respondent's experts, whom we found to be competent and persuasive. This figure exceeds both the $14,800 cash AFB paid in 1975 to Meisel, the film's producer, and the approximately $10,000 in net revenues that AFB has earned from the film since 1975. And those figures together amount to almost $25,000, the amount of the up-front cash that was allocated as a down payment on the film in the Burpee contract. In the AFB film shelters, the down payment or up-front cash was the only thing really negotiated. Although petitioner's expert, Anthony DiDio, valued the film at about $700,000, we do not accept his opinion. First, his experience was that of a film producer and investor, not a film distributor. His testimony about the mechanics of film distribution and his ascertainment of the relative value components (local distribution, foreign distribution, and television) were quite vague, general and lacking in corroborating detail. We simply reject his conclusory ipsedixit. *135 By contrast, each of respondent's experts had 30 to 40 years of experience in film distribution, and each provided specific, factual testimony about the mechanics and practical realities of film distribution. Moreover, Ray Axelrod, AFB's distribution manager and the only AFB employee competent to judge film values, testified to a "hindsight" projection of play dates and rentals that would have produced gross rentals of only $200,000. Axelrod's figure does not include distribution expenses, and, in any event, that figure is still substantially and unreasonably less than both the purchase price ($765,000) and the principal amount ($740,000) of the nonrecourse obligation. Finally, we do not accept petitioner's argument that the $740,000 nonrecourse deferred balance was a result of an arm's-length bargain or of AFB's business necessity. There was no negotiation of the contract price between petitioner and AFB. AFB determined the amount and presented it to petitioner as a fait accompli. Petitioner willingly acceded to AFB's figure without discussion or demur because it was in his interest to have a high "purchase price" for depreciation and investment tax credit purposes. The *136 facts belie any characterization of their bargain as "arm's length." Petitioner's further contention that the $765,000 "purchase price" was non-negotiable because that was AFB's cost is also not borne out by the facts. There was no negotiation between AFB and Meisel in regard to the purchase price. AFB set the figure and Meisel accepted it, negotiating only as to the amount of up-front cash he would receive. The $765,000 that AFB owed Meisel was payable solely out of film rental proceeds, and was thus wholly contingent upon the film's success. And as noted above, the $765,000 figure itself was not the result of arm's-length bargaining with either Meisel or petitioner. In this case, both the $740,000 principal amount of the nonrecourse obligation and the $765,000 contract price are grossly inflated and far in excess of the film's fair market value. Accordingly, the nonrecourse obligation is not bona fide indebtedness and will not support petitioner's claimed interest deduction. [16]
*137 To reflect the foregoing, Decision will be entered for respondent.
Footnotes
1. The deficiencies for the years 1972-1974 result from respondent's tentative allowance of refunds for those years from net operating loss and investment credit carrybacks from 1975. Thus, our resolution of the issues as to the 1975 motion picture transaction will dispose of all four years. In his petition, petitioner disputed another determination by respondent in 1975 disallowing a rental loss from a vacation cabin. Petitioner presented no evidence or argument on this question, and, accordingly he is deemed to have conceded this adjustment. Rule 149(b), Tax Court Rules of Practice and Procedure.↩
2. Before AFB acquired The Adulteress,↩ the film had also been distributed in foreign markets by Cinemas Overseas, but the record does not show the results of that distribution.
3. The agreement lists as "seller" an entity called Cry of the Rooster, Ltd., which Meisel testified was a mere bookkeeping entry and had never been an operating business. The documents do not name or discuss Films International, the copyright holder and the vehicle through which Meisel had financed the film's production. Consequently, we shall treat Meisel alone as the party to the agreement with AFB.↩
4. This is the only notarized document among the multitude of backdated, varying, and inconsistent documents purporting to evidence petitioner's acquisition of The Adulteress↩ from AFB.
5. Petitioner claims to have originally contracted to acquire The Adulteress↩ in July of 1975. Introduced into evidence was a promissory note to AFB for $25,000 signed by petitioner and dated July 10, 1975. Petitioner claims to have signed it in July, but we believe this document, too, was backdated. We think petitioner could not have signed the note in July because AFB, through Axelrod, did not become interested in acquiring Meisel's picture until the fall of 1975.Even if petitioner had signed the note in July of 1975, we do not believe it would establish that he acquired the film then. Tydings did not believe there was an "operative contract" until the middle of December. Petitioner testified he signed the note to "show good faith on [his] part," and that he did not believe there was an effective agreement in July when he claims to have signed the note. Even if petitioner signed the note in July, which we do not believe, it would at best evidence an option to acquire the film, not an actual acquisition in July. AFB did not acquire the film from Meisel until December of 1975.
6. Although what appears to be the final distribution agreement (a document dated December 18, 1975, and signed by petitioner and Landry for AFB) purports to give petitioner the right to terminate the distribution agreement at will, another clause of the Burpee contract gives AFB an option to require payment of the entire contract price as a condition of terminating the distribution agreement. Tydings understood and accepted this requirement when he negotiated the contracts for petitioner.↩
7. This "allocation" appears to have occurred much later than December of 1975. Aside from the allocation petitioner claimed on his return for 1975 (dated April 14, 1976), the only evidence of this "final allocation" is the summary of tax benefits accruing to an individual investor that AFB furnished to Tydings at some unspecified time during the negotiations and a letter from Landry to petitioner's attorney dated March 18, 1980, after this case was in litigation.↩
8. Petitioner had declined an opportunity in 1968 to invest in a Clint Eastwood "spaghetti western," choosing instead to purchase his chiropractic practice.↩
9. The Court notes that Ms. Daly recently starred in the CBS television series Cagney and Lacy.↩ That series received some critical acclaim but unfortunately has been cancelled. Because the valuation must be determined as of 1975, Ms. Daly's recent prominence does not affect our findings or our decision on valuation.
10. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
11. Throughout the findings of fact and opinion, we have generally refrained from characterizing this motion picture transaction as a "purchase" or "sale," and where we have done so it has been for descriptive purposes only and is not intended as a legal conclusion that there was a purchase or sale. We have some problem characterizing the acquisition of The Adulteress as a sale, because of the contingent and speculative nature of both the agreement between Meisel and AFB and the subsequent agreement between AFB and petitioner. Petitioner was to pay the deferred contract balance of $740,000 to AFB from 50 percent of the film rentals. AFB in turn was to pay the deferred contract balance of $765,000 to Meisel from 50 percent of the film rentals it received (50 percent of its 50 percent). It would seem that if petitioner over paid off the $740,000 to AFB, AFB would still owe Meisel some $395,000 (half of the $740,000 plus $25,000 since Meisel did not share in the $25,000 down payment made by petitioner). However, our result would be the same in this case whether we call the transaction a sale or a sham transaction. See Knetsch v. United States,364 U.S. 361 (1960); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184↩ (1983).
12. Under the terms of petitioner's agreements with AFB, even when he was in arrears in interest payments, AFB was entitled to retain only 75 percent of the net proceeds as payment of interest and principal on the nonrecourse "obligation."↩
13. Since petitioner's "purchase obligation" was nonrecourse, AFB's sole recourse was to repossess the movie.Since there is no time limit on payment of the nonrecourse contract balance in either the Meisel agreement or the Burpee agreement, there would not seem to be any event that would trigger a default and permit AFB to foreclose on the movie. However, assuming such a repossession did somehow occur, upon repossession, petitioner's amount realized would include the unpaid principal balance of any valid, bona fide nonrecourse indebtedness. See Tufts v. Commissioner, 455 U.S.     (1983); Crane v. Commissioner,331 U.S. 1 (1947). Since petitioner's basis would largely be exhausted by depreciation deductions, this could leave him with a large amount of gain, probably taxable as ordinary income under section 1245(b)(3). See also footnote 16, infra.↩
14. Section 183(b) provides in pertinent part: In the case of an activity not engaged in for profit * * *, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).↩
15. We note that in Brannen v. Commissioner,78 T.C. 471 (1982), on appeal (11th Cir., Aug. 23, 1982), we stated that the test was whether the stated purchase price unreasonable exceeds the value of the property, 78 T.C. at 493, whereas in Hager v. Commissioner,76 T.C. 759 (1981), we stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeds the value of the property, 76 T.C. at 773. We need not decide which test is appropriate on the facts before us (see Brannen v. Commissioner,78 T.C. at 513 (Chabot, J.,↩ concurring)), because we find that both the purchase price and the principal amount of the nonrecourse debt unreasonably exceeded the value of the film.
16. Our conclusion is not changed by the recent opinion of the Supreme Court in Commissioner v. Tufts, 455 U.S.     (51 U.S.L.W. 4518) (May 2, 1983), which held that where a taxpayer disposes of property encumbered by nonrecourse indebtedness in an amount that exceeds the fair market value of the property, the Commissioner may require him to include the outstanding amount of the nonrecourse obligation in his amount realized. That case involved the symmetrical treatment to be accorded where nonrecourse liability has been properly included in basis initially and must thereafter also be included in the amount realized on disposition of the encumbered property. The Supreme Court, relying upon the Commissioner's treatment and over 35 years of judicial sanction, held that the nonrecourse loan should be treated as a true debt in that situation. The Supreme Court held (455 U.S. at    ) as follows: We therefore hold that a taxpayer must account for the proceeds of obligations [nonrecourse loan] he has received tax-free and included in basis. Nothing in either § 1001(b) or in the Court's prior decisions requires the Commissioner to permit a taxpayer to treat a sale of encumbered property asymmetrically, by including the proceeds of the nonrecourse obligation in basis but not accounting for the proceeds upon transfer of the encumbered property. See Estate of Levine v. Commissioner,634 F. 2d 12, 15 (CA 2, 1980). The instant case does not fit within the context of Tufts and Crane v. Commissioner,331 U.S. 1 (1947). Our issue is whether or not the nonrecourse obligation is genuine indebtedness so that it can be properly included in basis at the front-end transaction. We have found that it was not genuine indebtedness and could not be properly included in the basis of the motion picture. Our decision is based on the unreasonably and artificially inflated amount of the nonrecourse indebtedness at the outset. That was not the fact in either Tufts or Crane.↩